**SCHENLEY INDUSTRIES, INC., Schenley Distillers, Inc., and Affiliated Distillers Brands Corp., Plaintiffs,**

v.

**N. J. WINE & SPIRIT WHOLESALERS ASSOCIATION et al., Defendants.**

Civ. A. No. 470–66.

United States District Court
D. New Jersey.

Aug. 9, 1967.

vision of Jurisdiction Between State and Federal Courts, proposed 28 U.S.C. § 1371(c) (Tent.Draft No. 5 1967).

Hannoch, Weisman, Stern & Besser, by Albert G. Besser, Richard E. Cherin and Ralph M. Lowenbach, Newark, N. J., for plaintiffs.

Pitney, Hardin & Kipp, by William P. Reiss, Newark, N. J., for New Jersey Wine & Spirit Wholesalers Association and Milton H. Cooper.

Toner, Crowley, Woelper & Vanderbilt, by Willard G. Woelper, Newark, N. J., for Crest Wine & Spirits, Ltd., and others.

Furst, Furst, Feldman & Bennenson, by David Feldman, Newark, N. J., and Joseph G. Liebman, Jersey City, N. J., for Gold Star Liquors, Inc., and others.

Harold Lasser, Newark, N. J., for Joseph H. Reinfeld, Inc., and others.

McCarter & English, by Nicholas Conover English, and Peter W. Tredick, Newark, N. J., for Crown, Ltd., and others.

Shanley & Fisher, by Harold Fisher, Newark, N. J., for defendants, Edward Feldman, Merchants Wine & Liquor

Company and Federal Wine and Liquor Company, Inc.

## OPINION

COOLAHAN, District Judge:

### I.

This is an action for injunctive relief and damages under the Sherman and Clayton Acts, 15 U.S.C. §§ 1, 2, 15 and 26. Venue lies since each defendant is an inhabitant or is found in the District of New Jersey. 15 U.S.C. § 15.

The plaintiffs are Schenley Industries, Inc., a Delaware Corporation engaged in distilling, blending, importing and distributing alcoholic beverages, and two of its wholly owned subsidiaries, Schenley Distillers, Inc., also a Delaware Corporation, and Affiliated Distillers Brands Corp. ["Affiliated"], a New York Corporation.

The defendants are the New Jersey Wine & Spirits Wholesalers Association ["Association"]; twenty-seven corporate members of the Association, all wholesalers of wine and distilled spirits in New Jersey [sometimes referred to as "defendant Wholesalers"]; thirty individuals who are principal officers or stockholders, or both, of the various defendant Wholesalers; and Mr. Milton H. Cooper, the Executive Director of the Association. Each of the individuals is alleged to have participated, for at least the last four years, in the adoption and execution of Association policies.

The production, importation and distribution of alcoholic beverages in which plaintiffs are collectively engaged constitute "commerce" within the meaning of the antitrust laws; this is not disputed.

Schenley [Unless otherwise noted "Schenley" is hereafter used to refer to all three plaintiffs collectively] charges that defendants have unlawfully restrained this commerce by dominating the wholesale of liquor in New Jersey. The complaint alleges that they conspired to and have fixed prices and profit margins at the wholesale level; attempted to and have monopolized the wholesale of liquor in this State; and have restrained Schenley's effort to promote competition in the industry.

The thrust of Schenley's grievance is twofold: First, it claims that through the Association machinery the defendants maintained unreasonably high profit margins by coercing individual wholesalers to reject pricing proposals suggested by Schenley. This was accompanied by an agreement among wholesalers handling Schenley products to restrict its market share by favoring competing products in their sales efforts.

Second, Schenley's attempt to circumvent the defendants by selling directly to retailers under Affiliated's wholesale license was unlawfully prevented by concerted lobbying on behalf of two recently enacted New Jersey statutes which preclude distiller-controlled companies from direct distribution to retailers in the State. Schenley also alleges improper attempts to influence decisions of the Division of Alcoholic Beverage Control, New Jersey Department of Law and Public Safety [hereafter referred to, and commonly known as, the "A.B.C."].

For convenience, I refer to the alleged attempts to influence the New Jersey Legislature and the A.B.C. as the "lobbying charges"; the remaining grievances in the complaint are denominated the "price fixing charges."

Defendants move for dismissal on the ground that, apart from whether plaintiffs can sustain their charges, both the alleged lobbying and the alleged price-fixing are protected from action under the antitrust laws; the former by recent Supreme Court interpretation of the Sherman Act, and the latter because it is sanctioned under New Jersey's comprehensive regulation of liquor pursuant to its power under the Twenty-first Amendment to the United States Constitution.

### II.

Movants for dismissal of a complaint must accept the facts alleged in the complaint as true for purpose of their motion. Continental Collieries v. Shober, 130 F.2d 631 (3rd Cir., 1942.)

It must appear to a certainty that plaintiff is not entitled to relief under any state of facts which could be proved to support his claim. "No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it." Ibid. 130 F.2d 635.

The necessary background to the issues thus joined includes New Jersey's powers under that Amendment vis-a-vis the antitrust laws; the statutes and regulations enacted by New Jersey to control the sale of liquor and the underlying policy they reflect; and the history of Schenley's conflict with the Association.

■ The long evolution of Federal and State regulation of liquor need not be repeated here, except to emphasize that the Twenty-first Amendment cedes vast plenary powers to the States, under which they can either exclude liquor entirely from their territory or stringently regulate such liquor as is permitted to be manufactured within or brought into their domain. See my opinion in Epstein v. Lordi, 261 F.Supp. 921, passim (D.N. J., three Judge court, 1966) "Note, The Evolving Scope of State Power under the Twenty-first Amendment", 19 Rutgers L.Rev. 759 (1965). Moreover, where New Jersey's power under the Amendment attaches to liquor for distribution or use within the State, it operates to the exclusion of conflicting Federal statutes under the Commerce Clause. Epstein v. Lordi, supra. See p. 9, infra.

In 1933 New Jersey enacted the Alcoholic Beverage Control Law, N.J.S.A. 33:1–1 et seq., establishing the Department of Alcoholic Beverage Control.[1] The framework provided by this statute, as amended, makes New Jersey a so-called "Open State", in which liquor is sold to the public through private channels that are in turn regulated by State agencies. That is, unlike some of her sister States which conduct the wholesale and retail of liquor as a State monopoly,[2] New Jersey has chosen to achieve the desired degree of control over distribution and sales through supervision of private enterprise by the A.B.C.

Much of the regulation involves detailed supervision of wholesale and retail operations which do not concern us; the New Jersey pricing system does. This system has undergone considerable evolution since its inception, but operates today essentially as follows.

The manufacturer (distiller, importer, or national distributor) must periodically list, or "post", with the A.B.C. the price at which it will sell each item to wholesalers for that period. Once posted, the prices are binding and must be uniform for all wholesalers without discrimination. In addition, it posts a second set of prices, which are the minimum resale prices to the consumer. This resale price list is distributed to all retailers by the A.B.C. which enforces compliance.

Third, wholesalers must file the price at which they will sell each item to retailers. They too must sell at the posted price to all retailers without discrimination. In the case of wholesale prices, however, there is a further procedure.[3] The

[1]. Through subsequent amendment of the statute, this Department has been changed to the present Division of Alcoholic Beverage Control, which is headed by the Director of Alcoholic Beverage Control. Hereafter, both the original Department of Alcoholic Beverage Control and the present Division of Alcoholic Beverage Control are referred to as the "A.B.C."; both the earlier office of the Commissioner and the present office of the Director are referred to as "the Director." See N.J.S.A. 33:1–3; N.J. S.A. 52:17B–15.

[2]. The liquor industry in New Jersey may be termed a regulated monopoly in the sense that participation at the distiller, wholesaler or retailer level is limited to licensees, whose number and qualifications are committed to the Director's discretion; but it is not a monopoly run as a branch of the State Department.

[3]. For clarity, I refer to the price at which liquor is sold by the distiller, importer, or national distributor at the "manufacturer's price". The price at which the wholesaler sells to retailers is referred to as the "wholesale price", and the price at which the retailer sells to the public is referred to as the "consumer price."

Regulations provide a brief inspection period after the wholesale prices are initially posted, in which wholesalers can examine all posted prices and raise or lower their own to meet competing prices. Once adjusted, the new prices then become binding and must be offered to all retailers alike. N.J.A.B.C. Regulations 30, 34.[4]

To review, it should be clear that by fixing both the consumer and the manufacturer's price, the distiller sets the outer limits within which a wholesaler can establish his profit margin. Once the producer has set those two prices, the wholesaler's determination of the price charged retailers not only sets his own profit margin, but also, in conjunction with the consumer price, sets the retailer's profit margin as well.

### III.

Although some semantical confusion has crept into the arguments, the basic nature of Schenley's grievance is readily comprehensible in terms of business realities without Talmudic exegesis of the pleadings.

Schenley is dissatisfied with its share of the New Jersey market. It feels that its competitive efforts are hindered by inflexible maintenance of unreasonably high wholesale profit margins. It has proposed to individual wholesalers that they decrease their profit margin on certain Schenley items, thereby partially absorbing a proposed decrease in the ultimate consumer price, which would also be shouldered by Schenley at the manufacturer's price level. Presumably, both Schenley and the wholesaler would realize net benefits from increased volume, notwithstanding the decrease in their respective profit margins.[5]

This elementary review helps put the charges and counter-charges in context. I deem Schenley's complaint to be that when Affiliated has proposed such mutual reductions in profit margin at the manufacturer and the wholesale price levels, some individual wholesalers have been amenable to the suggestion. But such tentative receptions of the possibility have been cancelled thereafter, Schenley claims, because the projected pricing framework was then rejected by the Association as a whole, or the bulk of it members acting collectively, in order to perpetuate uniform and unreasonably high profit margins.

Schenley alleges that through such group pressure, and threatened boycott of items for which Schenley's prices were found unsatisfactory, the defendants have collectively demanded a uniform profit margin for all items including those purchased from Schenley.

Having been thwarted in its efforts, Schenley decided to activate the wholesale license which for many years had been held and renewed by Affiliated.[6]

4. A further modification of this system was introduced when Regulation 34 was amended to permit "post-offs", a procedure whereby the manufacturer's price and the wholesale price could be reduced, by the producer and the wholesaler respectively, during the second or third month of each 90 day price filing period. A.B.C. Bull. 934–1 (1952).

5. Assume that Schenley, based on its analysis of market demand, foresees a competitive advantage to be gained for a new or lagging product by lowering the consumer price either to gain a market foothold or to increase revenue through a greater market share. While the producer theoretically is free to set whatever consumer and manufacturer prices it chooses, in the real commercial world this is not necessarily the case. Schenley admits unblushingly that it seeks greater profits. It could, of course, absorb any proposed price decrease to the consumer completely by itself, leaving the wholesaler's profit margin undisturbed. But it can also try to convince the wholesaler to absorb some of the reduction in its wholesale profit margin and, like Schenley, seek its benefit from increased volume. If Schenley calculates that the economic feasibility of its plans, including for example its ability to increase revenue and at the same time provide enough incentive for the retailers to promote a Schenley item, lead it to attempt to persuade the wholesaler to help absorb the reduction, then this Court, for purposes of the motion, must accept the proposition that the plan is economically realistic and the allegation that some wholesalers were willing to participate.

6. See note 15, infra, p. 14.

Warehouse space was purchased, truckers hired, and other arrangements completed for Affiliated's direct sale and distribution of Schenley products to retailers. In April of 1966, Affiliated filed a wholesale price list with the A.B.C. for the summer period. The A.B.C. indicated it was too late for that period and would be treated as an application for filing in the subsequent period beginning in September.

Meanwhile, after this action had been instituted, the aforementioned statutes were passed with impressive alacrity by the New Jersey Legislature. Chapters 58, 59, 1966 Session Laws. Essentially they prohibit any distiller, or company owning an interest in or connected with a distiller, from engaging in the wholesale of alcoholic beverages to retailers in this State. Plaintiffs allege that both the rejection of the price filing and the statutes resulted from improper lobbying.

The statutes were enacted before any proceedings could go forward in this Court. Following their passage Affiliated sued the State in the Chancery Division of the Essex County Superior Court for a judgment that the two provisions were unconstitutional. Affiliated Distillers Brands Corp. v. Arthur J. Sills and Joseph P. Lordi, Docket No. C-3085-65 (Sup.Ct.Ch., Essex). That action is still pending. A group of New Jersey wholesalers who are also defendants here were denied the right to intervene. Affiliated v. Sills and Lordi, supra. Order of November 22, 1966.[7]

### PRICE-FIXING CHARGE.

### IV.

Defendants contend that the price-fixing charges raise a "head on clash" between New Jersey's power under the Twenty-first Amendment and the Commerce Clause power underlying the Federal antitrust laws. They claim that at such an impasse, it is the antitrust laws which must give way to State regulation of liquor for use or consumption within its territory.[8]

Schenley denies a confrontation. Assuming, arguendo, that State power under the Amendment would prevail if such a clash existed,[9] Schenley contends it

---

7. The bulk of the New Jersey wholesalers sought to intervene as a class on the ground that their interest would be vitally affected by the litigation. The Complaint in the State action repeated many of the same allegations about unlawful concerted lobbying and conspiracies in restraint of trade advanced here. The wholesalers claimed the right to intervene and protect themselves from adverse findings by the Superior Court on those issues. Judge Herbert denied intervention on the ground that the constitutionality of the statute was a distinct issue independent of the motives of some advocates and, therefore, independent of any antitrust violation. He ruled that the trial and decision of such antitrust matters should be reserved for the present lawsuit before this Court. Oral Opinion, Motion to Intervene, (Tr. 48, 49).

8. Defendants admit this power is limited by the requirement the liquor is for use or consumption within the State; through shipments for use elsewhere may still be regulated under traditional police power, but subject to the confines of the Commerce Clause and Federal statutes thereunder. Epstein v. Lordi, supra.

9. Schenley suggests that in fact recent decisions, particularly Hostetter v. Idlewild, 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1963) and Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1965), may diminish the State's traditional plenary power under the Amendment if a sufficiently strong national interest requires accommodating the two. Hence, even if there is a collision between New Jersey liquor law and the Sherman Act, Schenley argues the latter must be enforced here because the violations so clearly threaten the national interest in unrestrained commerce. I have already rejected this interpretation, at least in regard to the *Idlewild* case, and concluded that the State and Federal interests must be accommodated to determine whether the Amendment applies to the liquor traffic at all, rather than whether the Federal interest defeats the exercise of State power over liquor to which the Amendment admittedly attaches. Epstein v. Lordi, supra, 261 F.Supp. at 933–934. In the *Seagram* case, the Court deferred deciding New York's ability to enact liquor laws which restrained trade or produced restraints in other States; but it

does not arise since the enforcement of the Sherman Act it seeks would not defeat New Jersey's regulatory scheme.

Is the price-fixing activity alleged protected by New Jersey law? Defendants present voluminous materials on the legislative history and evolution of the Alcoholic Beverage Control Act and Regulations. Boiled down, they indicate the following. New Jersey has chosen vigorous control of the industry. With recent memory of the evils rampant during Prohibition, the regulatory scheme has been fashioned and amended with one central theme: the preservation of an orderly market so as to prevent cutthroat competition, price discrimination, revival of racketeering, or unduly cheap liquor. Grand Union Co. v. Sills, 43 N.J. 390, 397–400, 204 A.2d 853 (1964); and see the Preamble, 1939 Amendment to the Act, L.1939, c. 87, p. 174; N.J.S.A. 33:-1–3, 39.[10] To the extent traditional free competition conflicts with the above aims, New Jersey has forsaken the dynamics of an open market for these other social goals. Grand Union Co. v. Sills, supra, 43 N.J. at 397–398, 204 A.2d 853.

These policies are implemented by the pricing system and the enforcement program. Listed prices, binding on all purchases, prevent discrimination. The inspection period for readjustment of initially posted prices to meet competing ones encourages uniform price levels. Defendants assert that the challenged practices flow from such regulation and thus fail to state a claim on which relief can be granted.

■ Unless a State has affirmatively adopted a policy of price fixing by private groups, such action is not protected by the Twenty-first Amendment. United States v. Frankfort Distilleries, 324 U. S. 293, 65 S.Ct. 661, 89 L.Ed. 951 (1945); [11] accord, United States v. Erie County Malt Beverage Distributors, 264 F.2d 731 (3rd Cir., 1959). That policy may be indicated either by a direct price fixing statute requiring such action, or by permissive sanction. Frankfort Distilleries, supra, 324 U.S. at 301, 65 S.Ct. 661 (Mr. Justice Frankfurter concurring), but it should not be lightly implied unless clearly expressed by State statute or case law. Ibid. A Federal court should hesitate to find such a conflict between the Sherman Act and State law unless it clearly exists. Joseph E. Seagram & Sons, Inc. v. Hostetter, supra, 384 U.S. at 45, 86 S.Ct. 1254. It should be slow to assume New Jersey has sanctioned a conspiracy in violation of the Sherman Act. Washington Brewers Institute v. United States, 137 F.2d 964, 968 (9th Cir., 1943) cert. denied, 320 U.S. 776, 64 S.Ct. 89, 88 L.Ed. 465 (1943).

On the one hand, the Wholesalers claim that since New Jersey provides the vehicle of Regulation 34 to promote price coordination, any concerted action resulting in uniformity is sanctioned by the State in the sense required by *Frankfort Distilleries*. Schenley, on the other hand, argues that no statute or judicial decision warrants the inference, let alone holds, that New Jersey sanctions price-fixing in the manner alleged. That is the cutting edge of this issue. Unquestionably New Jersey sanctions price uniformity. Grant also that it provides considerable machinery and procedures to

reiterated that " 'a State is totally unconfined by traditional Commerce Clause limitations when it restricts the importation of intoxicants destined for use distribution, or consumption within its borders.' " 384 U.S. at 42, 43, 86 S.Ct. at 1259.

10. Under Sec. 39, the Director has residual power to issue further proscriptions of practices "designed to unduly increase liquor consumption * * *."

11. In *Frankfort*, still the leading case on this point, the Government charged both a horizontal conspiracy among wholesalers and a vertical one among wholesalers, retailers and distillers. The Court found such combinations were "expressly exempted from the scope of the Fair Trade Act of Colorado and thus have no legal sanction under state law either." 324 U.S. at 299, 65 S.Ct. at 664. In a distinction not irrelevant here, it noted that the coercive pressure on reluctant distillers to participate went beyond the mere restraint engendered by the fair trade contracts themselves.

foster such uniformity at the wholesale level. The critical question which remains is whether it has authorized collective coercion designed to force individual wholesalers to set prices they would not choose on their own, merely because such coercion produces price uniformity. Simply put, the defendants' theory reduces to a claim that the end justifies the means; the goal being price uniformity, any means collectively taken by the wholesalers to that end is sanctioned.[12] This is an extremely dubious proposition to say the least.[13]

■ Defendants have not shown this to be the case. From their presentation thus far, it appears that New Jersey merely sanctions price adjustment under Regulation 34, plus coordination of cost and pricing data. But dissemination of coordinated analyses or even suggested prices is not the same as coercion or discipline of members who decide to differ. Cf. Maple Flooring Mfrs.' Assn. v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L. Ed. 1093 (1925). There is no indication that New Jersey's sanction of private action in pursuit of an orderly market extends to the elimination of an individual's right to set his own price and, concomitantly, to freely discuss this price with his supplier. Yet coercion of wholesalers who were willing to consider Schenley's proposals for reduced profit margins forms the heart of its price-fixing charge.

Defendants are right that if the Director is dissatisfied with the prices produced by the present machinery, he can set other prices himself. However, he has not yet chosen to go this far. Until he does, this potential power, though indicative of State policy, is not tantamount to a present requirement of a single set price. In the meanwhile, the State has not abrogated all competition in marketing alcoholic beverages, and the Federal concern remains facilitating that

12. "Uniformity among wholesalers is not expressly dictated, but the design of Regulation 34 is such as to channel wholesalers into a pattern of uniformity in order to maintain a stable and orderly market. Actions which promote uniformity implement State policy and therefore cannot be said to violate the Sherman Act." Defendants' Brief, p. 47.

Defendants seek to buttress this approach with a rather creative "legislative history" from which they conclude New Jersey has sanctioned any type of coercion, by virtue of its failure to criticize collective price-fixing. New Jersey progressed from mere retail fair trade to price and trade practice regulation at the wholesale and distiller levels, through a series of statutory and regulatory amendments reviewed in Duff v. Trenton Beverage, 4 N.J. 595, 73 A.2d 578 (1950) and Canada Dry Ginger Ale, Inc. v. F. & A. Distributing Co., 28 N.J. 444, 147 A. 2d 15 (1958). Defendants have detailed the successive opposition to each increase in regulation on the ground that it was extending fair trade upstream to promote uniform profits and price levels. See A.B.C. Hearings, *passim* (1938, 1939, 1940). They correctly note that despite this criticism, the Director adopted each step. But their loose inference of legislative intent by the A.B.C. to sanction the collective price decisions complained about at the hearings, hardly meets the test laid down in Joseph E. Seagram & Sons, Inc. v. Hostetter, or Mr. Justice Frankfurter's concurrence in *Frankfort Distilleries* for a clear sanction of practices violating the Sherman Act.

Even their archaelogy of past attacks by Schenley on Regulation 34 is inconclusive, since that history contains no adjudication that the Regulation sanctions pressure on recalcitrants, as distinct from collective decisions which are not binding.

13. To put the matter starkly, would defendant Wholesalers contend that if the Association used threats of physical violence to intimidate a wholesaler into charging a particular price, that such behavior would be "sanctioned" by New Jersey's policy of promoting price uniformity?

Even the strongest decision in defendants' favor, which contemplated that acts not expressly condoned or required by State law might be beyond the reach of the Sherman Act, required that they *"reasonably implement* the policy of the State." United States v. Maryland State Licensed Beverage Ass'n, 138 F.Supp. 685, 702 (D.Md.1956) rev'd on other grounds, 240 F.2d 420 (4th Cir., 1957), [Emphasis added].

competition within the limits set by the State framework.[14]

## V.

Defendants' several subsidiary contentions are also without merit. The argument that the Complaint reveals Schenley's own attempted price-fixing conspiracy is flawed by the assumption that Affiliated is a horizontal competitor of the defendant wholesalers in regard to the present charges.[15]

Alternatively, Schenley's complaint that it could not bargain individually with each wholesaler is said to contravene New Jersey policy against undue pressure exerted by the distiller on a wholesaler. Canada Dry Ginger Ale, Inc. v. F. & A. Distributing Co., supra, 28 N. J. at 455, 147 A.2d 15. The inarticulated premise here is that through individual negotiations over proposed pricing Schenley sought to dictate prices to wholesalers, who would only enter such a Faustian bargain because of undue leverage on Schenley's part.

Extraneous factual assertions are not a basis for a motion to dismiss the Complaint. The trial will be the place for proof of such leverage. But Schenley's present allegation is that each wholesaler was free to decide whether he wished to handle Schenley's products within the proposed price framework, while Schenley had a right to try to convince him, free from external threat and coercion, that it would be profitable.

Next, defendants claim that the price filing and inspection procedure relies on private industry to accomplish the desired price regulation; they conclude that, even apart from the effect of the Twenty-first Amendment, such delegation of State authority casts them as public agents and protects their collective efforts from the Sherman Act. Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1942). Parker v. Brown upheld a State proration plan which limited production and fixed prices for California raisin growers. That case and Asheville Tobacco Bd. of Trade v. FTC, 263 F.2d 502 (4th Cir., 1959) are easily

---

14. Indeed, competition is assumed by Regulation 34's permission to lower initially posted prices "to meet * * * competing prices * * *." The alleged conspiracy prevented certain wholesalers from filing such a lower price even when it was a price agreeable to it and to the distiller. It is therefore, if anything, a conspiracy which prevents precisely the type of competition envisioned by the statute. Defendants' suggestion that the Regulation permits inter-brand competition at the distiller level, but seeks to avoid intra-brand competition at the wholesale level is belied by the Regulation's express language. Moreover, this distinction, critical in many areas of antitrust enforcement, is blurred here by the fact that it is precisely Schenley's attempt at inter-brand competition with other distillers which it claims was stymied by the conspiracy to prevent intra-brand price competition on Schenley products by a few wholesalers.

15. Taking plaintiffs' allegations as true, Affiliated has hitherto acted primarily as Schenley's marketing arm in New Jersey, selling and distributing to the defendant wholesalers which carried Schenley products. Hence, its economic relationship to those wholesalers was a vertical rather than a horizontal one. Affiliated was acting under its wholesale license even in this regard since the license is required not only for wholesale to retailers, but also for certain activities carried on in connection with sale to wholesalers. Affiliated does not deny that for a few private brands sold by Schenley directly to retailers, it (Affiliated) acted in coordinate status with defendant Wholesalers. But this was a peripheral aspect of its activity, unrelated to the gravamen of this action. Defendants' analysis premised on Affiliated being a horizontal competitor, therefore, misses the mark.

Of course the term "price fixing" has been used throughout this proceeding in two senses: an individual distiller or wholesaler setting a price which becomes "fixed" under the binding filing system; and second, a joint decision by two or more competitors that they will charge the same price. Compare the following illustration. "Such provision will not in any sense constitute price fixing, for the manufacturers and wholesalers will still fix their own prices." A.B.C. Bull. 281 (1938).

distinguished.[16] Moreover, as I have just noted, even if some delegation could be implied, there is no indication it authorizes coercion of Association members.

## VI.

Finally, the defendants have raised the spectre of abstention, and argue that because the sufficiency of the Complaint depends upon questions of New Jersey law and policy, this lawsuit should be stayed until those questions are resolved in the State courts.

■■ Generally, Federal courts have a duty to hear over matters entrusted to its jurisdiction, Propper v. Clark, 337 U. S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949) notwithstanding the pendency in a State court of an action concerning the same matter, McClellan v. Carland, 217 U.S. 268, 30 S.Ct. 501, 54 L.Ed. 762, or the necessity to resolve difficult questions of State law required to reach judgment on the Federal matter. Meredith v. City of Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943); Siler v. Louisville & N. R. R., 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909). A fortiori, it is the duty of this Court to decide cases and questions arising under Federal statutes which vest exclusive jurisdiction in the District Courts, such as the Clayton Act, 15 U.S.C. § 15. MachTronics v. Zirpoli, 316 F.2d 820 (9th Cir., 1963); Lyons v. Westinghouse Electric Corp., 222 F.2d 184 (2nd Cir., 1955), cert. denied, 350 U.S. 825, 76 S.Ct. 52, 100 L.Ed. 737.

An exception lies in a narrowly specified class of unusual cases when a Federal court may properly abstain from proceeding to decide a matter within its jurisdiction in order to permit State court adjudication of State law and policy involved in the Federal case. The Supreme Court has warned that such abstention is an extraordinary disruption of Federal jurisdiction, to be used "only in the exceptional circumstances where the order to the parties * * * would clearly serve an important countervailing interest". County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188–189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959).

■ Three main types of countervailing interests are grouped under the general heading of "abstention." Thus, the doctrine has been applied where prior disposition of questions of State law might obviate a Federal constitutional issue, Railroad Comm. of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), or might materially alter or reduce the constitutional problem. Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959). A second use is to avoid needless friction with a State's administration of its own affairs and internal policy, Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138 (1951) (State criminal law); Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L. Ed. 1407 (1943) (State taxes), particularly where a complicated regulatory system of local law involves important public policies. Burford v. Sun Oil, 319 U.

---

16. New Jersey's encouragement of price stability through price filing falls far short of the express delegation to the raisin growers to propose and approve the proration plan. Further, the Supreme Court emphasized that it was still the State of California which had to give final approval and enforce the program. 317 U.S. 352, 63 S.Ct. 307. Discussing this notion of "state action", the Fourth Circuit Court of Appeals warned: "But such action must be state action, not individual action masquerading as state action. A state can neither authorize individuals to perform acts which violate the antitrust laws nor declare that such action is lawful." Asheville Tobacco Bd.

of Trade v. FTC, supra, 263 F.2d at 509.

Hudson, Bergen, etc., Ass'n v. Hoboken, 135 N.J.L. 502, 52 A.2d 668 (E. & A., 1947) is also offered for the proposition that liquor trade associations share with New Jersey the burden of regulating and controlling liquor traffic. That decision simply upheld the retailer association's standing as an "aggrieved person" to seek prevention of an additional retail license in Hoboken. In fact, the decision viewed the association's purpose as a private interest which harmonized with the public interest, not as a delegation of State authority. 135 N.J.L. at 510, 52 A.2d 668.

S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); Alabama Public Service Comm. v. Southern R. Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). Finally, abstention has been ordered in diversity cases where difficult questions of State law arise in sufficiently special circumstances to warrant the comity of federalism. Compare Meredith v. City of Winter Haven, supra; Louisiana Power and Light Co. v. Thibodaux City, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); and County of Allegheny v. Frank Mashuda Co., supra.[17]

Abstention was rejected in Mach-Tronics v. Zirpoli, supra, since none of these factors—constitutionality, friction with State regulation or prerogative or unclear State law—was present, 316 F.2d at 827–828. In fact, *Mach-Tronics* and *Lyons*, supra, involved the converse of the usual abstention situation, and presented at most the propriety of abatement.[18] They teach the need for uniform application of the antitrust laws, unfettered by anticipatory findings in the State tribunals, in order to fully vindicate private rights and the national policy embodied in the punitive two thirds of treble damage recovery. *Lyons*, supra, 222 F.2d at 189.

■ There is equally no need to abstain here, even though the applicability of the Sherman Act depends on the effect of New Jersey liquor laws. Within the framework provided by *Frankfort Distilleries*, no Federal constitutional problems arise. Nor would the relief requested disrupt operation of the regulatory scheme; the pricing system would still apply to the parties. Cf. Hostetter v. Idlewild, supra, 377 U.S. at 329, 84 S.Ct. 1293, 12 L.Ed.2d 350. It would not produce friction with State policy for the reasons discussed above. As for the fact that a question of State law is involved, it is sufficiently clear that the statute and regulations do not sanction the activity alleged. Moreover, even if the question was closer, the considerations stressed in the *Mach-Tronics* case would outweigh that difficulty in the absence of other special circumstances. See note 17, supra.

Finally, defendants' reference to the pending Chancery action is misplaced. Nothing that Court may decide will dispose of the issue of State law raised here, as Judge Herbert himself has stressed. See note 7, supra. Nor would relief here tie his hands in any way.

## LOBBYING CHARGES

The next issues is the request to strike parts of the Complaint which predicate illegal antitrust conspiracy upon lobbying. Despite extensive argument, it is

17. *Allegheny* and *Thibodaux* were both diversity cases involving eminent domain proceedings. In the former, State law appeared settled, in the latter it did not. The Court approved abstention in *Thibodaux*, stressing the special nature of eminent domain as an aspect of sovereign prerogative, although this aspect was dismissed as insignificant in *Allegheny*, decided the same day. The combined effect of these, and later cases, on the *Meredith* holding has perplexed the commentators, but the most persuasive view is that the special nature of certain local proceedings involving State policy prerogatives when joined with difficult questions of State law, warrant abstention, although neither individually would suffice. The special circumstances factor seems to counterbalance the absence of a regulatory system found in *Burford* as well as the fact that *Thibodaux*, unlike past abstention cases, involved no equitable relief. See "Note, Federal-Question Abstention," 80 Harv.L.Rev. 604 (1967); Handler, "Jurisdictional Abstention in Federal-State Branch Bank Conflicts", 19 Rutgers L.Rev. 445 (1965); Wright, Federal Courts, 169–177.

18. In each, a treble damage action was brought by a plaintiff who had raised the same antitrust issues as defenses in a State action. The refusal to abate in *Lyons* was based on the conclusion that the Federal trial would not be estopped by the State court's finding no antitrust violation. This was, in short, not a circumstance where abstention might be considered to avoid a Federal decision on matters of State law; the danger was one of State courts intruding on Federal law. Hence, the *Mach-Tronics* opinion concluded that where a State action was still pending, a Federal Court should jump in feet first to avoid even the possibility of estoppel. 316 F.2d at 832–833.

not fully clear whether Schenley still asserts liability for lobbying or merely seeks to explore such activity as relevant evidence of the design and intent of the price-fixing conspiracy.

Schenley concedes that neither defendants' concerted effort nor their anti-competitive purpose could make lobbying unlawful. Eastern R. R. Presidents Conference v. Noerr Motor Freight, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1966). It further agrees that no damages lie for lawful lobbying and that, in any event, the injunctive relief originally sought in this regard is now moot.

Schenley now emphasizes its desire to prove lobbying as indicative of the defendants' hostility toward Schenley and of their scheme to block any competitive efforts which could undermine their oligopoly.

In addition, however, Schenley continues to suggest that the lobbying itself, if sufficiently illegal apart from its antitrust aspect, is not shielded from liability under the Sherman Act. Schenley argues that *Noerr* and *Pennington* protect lobbying merely misleading or unethical, but do not extend to acts flagrantly violative

of state law. Therefore, it seeks to retain those charges in the Complaint pending full discovery, at which time it will decide whether to offer lobbying so illegal as to fall within the antitrust laws, or merely to offer lobbying as collateral evidence on the remaining charges.

For the following reasons, I disagree and conclude that the portions of the Complaint which allege lobbying as part of a conspiracy in violation of the Sherman Act shall be stricken. What this Court may later decide on the appropriate scope of discovery and admission of evidence at trial, is another matter; but an attempt at such delineation now would be premature.

■■ *Noerr* and *Pennington* make clear that concerted private effort to influence government action does not violate the Sherman Act, no matter how self-interested, devious, or anti-competitive. "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." United Mine Workers of America v. Pennington, supra, 381 U.S. at 670, 85 S. Ct. at 1593.[19] The Supreme Court did reserve one exception to this broad protection; but it did not apply in *Noerr* and does not apply here.[20] To be sure,

19. In *Noerr*, a truckers association was aggrieved by the railroads procuring a veto of a Pennsylvania bill permitting heavier truck loads on highways of that State. The Third Circuit Court of Appeals had affirmed a judgment for the truckers. The Supreme Court reversed, holding it did not matter that the sole aim of lobbying was to put a competitor out of business, or that as a by-product of the lobbying propaganda the competitor suffered loss of public trust. Further, even the lobbyist's foreknowledge that such incidental damage would ensue, apart from the impact of the bill, was deemed immaterial. "It is inevitable, whenever an attempt is made to influence legislation through a campaign of publicity that an incidental effect * * * may be the infliction of some direct injury upon the interest of the party against whom the campaign is directed." 365 U.S. at 143, 81 S.Ct. at 533.

*Pennington* involved the antitrust counterclaim by the defendant coal company

against the Mineworkers who had sued for royalty payments. The company alleged that the UMW and certain large coal operators had conspired to drive out the small operators by various means, including joint efforts to influence the Labor Department, and the T.V.A.

The Supreme Court reversed a verdict against the UMW, citing *Noerr*. It held that although the Union was not exempt from the Sherman Act for agreements with the large operators to secure uniform wages throughout the industry, joint efforts to influence the Secretary of Labor and the TVA did not violate the Act. 381 U.S. at 670, 85 S.Ct. 1585.

20. If a lobbying campaign, "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relations of a competitor", the Sherman act might apply. But in *Noerr*, it was undenied the railroads genuinely were trying to influence legislation. 365 U.S. at 144, 81 S. Ct. 523. And so here, Schenley's own

the impropriety alleged in *Noerr* was only deceptive use of a third party organization, ostensibly independent but actually railroad controlled. There was no issue of bribery, extortion or the like, although the exact status under Pennsylvania law of such partial disclosure is unclear from the opinion. But Schenley's attempt to limit *Noerr* and *Pennington* to their factual situations and to distinguish lobbying blatantly illegal under State law misses the basic point of those decisions. The antitrust laws simply do not comprehend such political activity as concerted lobbying to influence governmental action.

Schenley reads *Noerr* as merely expressing the Court's disinterest in the sharp practices of misrepresentations of some lobbying specialists. On the contrary, the Court first weighed several considerations that convinced it Congress had not intended the Sherman Act to reach political activity which produced restraints on commerce via governmental acts or policies.[21] The Court then found the same considerations impelled the conclusion that the nature of the lobbying methods employed was legally irrelevant for antitrust purposes. Since political activity to influence public officials is beyond the purview of the

Act, it does not matter that independently illegal acts can be shown; separate civil or criminal actions might lie against the perpetrators, but the lobbying is not thereby transmuted into a violation of the Act. A private antitrust complaint is not the appropriate vehicle for state criminal laws whose enforcement is entrusted to state or local prosecutors.[22]

Nor does Schenley's portrayal of the alleged lobbying as a subsidiary conspiracy in the overall scheme to dominate the wholesale industry make such lobbying actionable under the antitrust laws. Speaking for the Court in *Pennington,* Mr. Justice White rejected the trial instruction that the jury "was free to find an illegal conspiracy based solely on the Walsh-Healey and TVA episodes, *or in any event to attribute illegality to those acts as part of a general plan to eliminate Phillips and other operators similarly situated."* 381 U.S. at 670, 85 S.Ct. at 1593. The Justice concluded:

"Neither finding, however, is permitted by Noerr for the reasons stated in that case. Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. *Such conduct is not illegal, either standing alone or*

Complaint charges the defendants were very much interested in influencing the Director and obtaining passage of the bill.

21. The opinion started with prior decisions holding that restraints on trade which resulted from official action, as opposed to private action, were not within the Sherman Act, even if a state or federal regulatory program expressly imposed the restraint. United States v. Rock Royal Co-op., 307 U.S. 533, 59 S. Ct. 993, 83 L.Ed. 1446 (1942) ; Parker v. Brown, supra. The Court found it equally clear that the Act does not proscribe concerted effort by private persons to achieve such official action. First, the Court stressed the fundamental dissimilarity between joint attempts to influence the political policy process and the sorts of private business agreements and combinations traditionally condemned under the Act. Second, it found no shred of legislative intent that the Act impinge on the normal channels of rep-

resentative democracy which assume private effort to influence as well as educate the elected and appointed representatives. Finally, the Court avoided a construction of the Antitrust laws which would raise very serious Constitutional problems regarding the First Amendment right of petition. 365 U.S. at 136–138, 81 S.Ct. 523. See N. A. A. C. P. v. Button, 371 U.S. 415, 452, 83 S.Ct. 328, 9 L. Ed.2d 405 (1962) (Mr. Justice Douglas concurring).

22. 365 U.S. at 139–143, 81 S.Ct. 523. Moreover, the Complaint alleges no specific criminal acts in connection with the lobbying, but rather fires a broadside of general charges that the lobbying was improper. False and defamatory statements are attributed to the lobbyists, but Schenley's other vague allegations of corruption, made during argument on the motion, present no more than the apparent desire to commence a fishing expedition.

*as part of a broader scheme itself violative of the Sherman Act."* Ibid. [Emphasis added].

Thus, even if the lobbying is viewed in the context of a larger scheme to fix profits and prices, its characterization as a supplementary phase of that conspiracy affords no basis for imputing illegality. Since no claim for relief may be predicated on the allegations that defendant Wholesalers sought to influence governmental action, such allegations should be stricken from the complaint. A. B. T. Sightseeing Tours v. Gray Line New York Tours, 242 F.Supp. 365, 369 (S.D.N.Y.1965).

Schenley's alternative position, stressed at oral argument, is retention of the lobbying charges in the Complaint as explanatory of evidence it will offer to substantiate the Wholesalers' evil designs. In a footnote to the *Pennington* opinion, the Supreme Court did leave open the use of evidence on protected lobbying activity in the manner Schenley proposes, namely, to demonstrate anticompetitive intent.[23]

Nonetheless, the Complaint framed pleads the lobbying as part of the conspiratorial behavior for which damages are sought. This is invalid. And as an evidentiary pleading, the allegations are subject to judicial pruning.

Schenley has discretion to frame its pleadings as it sees fit. While a complaint, under Rule 8, F.R.Civ.P., need only recite "a short and plain statement of the claim showing that the pleader is entitled to relief," material allegations elaborating the claim on which relief is sought may be included in appropriate circumstances. Such gratuitous charges can be stricken, however, to avoid prejudice and to avoid requiring a defendant to plead to matters of evidence. Minnesota Mining & Mfg. v. Carborundum Co., 7 FR Serv. 12 f. 21; 3 F.R.D. 5 (D.Del., 1943). On the particular facts at Bar, the nature of the alleged conspiracy is amply spelled out by the remainder of the detailed complaint. Any additional enlightenment which retention of the lobbying charges might now provide is clearly outweighed by the prejudicial connotations the term "lobbying" has acquired in common usage and by the emotional reaction such material might engender in the trier of fact.

Moreover, under the footnote in *Pennington,* on which Schenley relies, it is within the province of the trial court to exclude such evidence even at trial if it is insufficiently probative or unduly prejudicial or dilatory. United States v. Johns-Manville Corp., 259 F. Supp. 440, 453 (E.D.Pa., 1966).[24]

Finally, there is the important consideration that the bounds of proper discovery are set by the pleadings. Unquestionably, the present skirmish on this portion of the Complaint is tied to the larger battles over discovery which loom on the horizon. Since I have stayed discovery pending my ruling on the Complaint, Schenley's evidentiary argument presents the Court with something of a "chicken or the egg" question of priority.[25]

23. United Mine Workers of America v. Pennington, supra, 381 U.S. at 670, n. 3, 85 S.Ct. at 1593. That footnote reads: "It would of course still be within the province of the trial judge to admit this evidence, *if he deemed it probative and not unduly prejudicial,* under the 'established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transaction under scrutiny.' [Citations omitted]" [Emphasis added].

24. In the *Johns-Manville* case, Judge Van Dusen also raised the important consideration of whether inferring unlawful conduct from predatory intent which was in turn inferred from constitutionally protected conduct would infringe defendants' First Amendment rights. 259 F. Supp. at 452.

25. Plaintiffs originally obtained leave of Court under Rule 26 to depose Milton Cooper in regard to his lobbying activi-

Almost unanimously, the many judicial conferences and expert panels which have considered discovery in protracted cases recommend containing it within manageable proportions by first narrowing the issues and pruning the complaint through appropriate motions or other pretrial proceedings. On the other hand, the antitrust conspiracy is by nature secretive and hard to establish; plaintiffs are often forced to plead generalities at the outset until some discovery permits them to specify the relationship among their claims.

With both these considerations in mind, I still find it appropriate to dismiss those portions of the Complaint alleging lobbying in furtherance of the antitrust conspiracy. Subsequently, the Court will entertain motions on specific discovery regarding attempts to influence governmental action, with the burden on plaintiffs to demonstrate its relevance and necessity for the prosecution of the remainder of this action. See United States v. Johns-Manville, supra.

## STATUTE OF LIMITATIONS

### VII.

Treble damage actions under the Sherman Act and Clayton Act must be commenced within 4 years "after the cause of action accrued." 15 U.S.C. § 15b. The cause of action accrues from a specific overt act causing damage, rather than from the mere inception of an antitrust conspiracy, Farbenfabriken Bayer, A. G. v. Sterling Drug Co., 153 F.Supp. 589 (D.N.J.1957) aff'd on other grounds, 307 F.2d 210 (3rd Cir., 1962) cert. denied, 372 U.S. 929, 83 S.Ct. 872, 9 L.Ed.2d 733 (1965). Hence, Schenley concedes that it must show an overt act within four years preceding the Complaint which proximately caused damage.

Defendants would carry this a step further. They argue that Schenley cannot recover at all for acts which occurred more than four years prior to the complaint, and, therefore, that allegation of such acts should be stricken.

At the least, such acts are admissible evidence and proper areas of discovery, within the limits imposed on both discovery and admissibility by other considerations. "The asserted history of the conspiracy and not the scope of plaintiff's damage provides the temporal boundary for the discovery." Hillside Amusement Co. v. Warner Bros., 7 F.R. D. 260 (S.D.N.Y., 1944).

Schenley contends that overt acts within four years past are necessary to start the Statute running anew, but that, once in the courthouse door, it can even recover for damages caused by earlier acts which are part of a continuing conspiracy.

Insofar as such acts are alleged to have caused damage within the last four years, I agree. In the first place, the legislative intent behind Section 4B of the Clayton Act, 15 U.S.C. § 15b, was not so much the expunction of long standing claims as it was the effective enforcement of the Act through a uniform period of limitations throughout the nation which would reduce forum shopping. Westinghouse Electric Corp. v. Pacific Gas & Electric Co., 326 F.2d 575, 580 (9 Cir., 1964) (and authorities cited).

Secondly, the defendants' reference to the so-called "overt act doctrine" in this Circuit is misleading, since the Farbenfabriken Bayer case turned on the absence of any overt act alleged within the period of limitations. Moreover, even within that frame of reference, the opinion by Judge Smith is not very helpful to the defendants since he concluded that

ties; service of notice within 20 days of the complaint was based on the need to depose him while his recollection was fresh. The defendants were also sent numerous interrogatories some of which explored lobbying. Defendants objected that such discovery should not proceed

until the Court ruled on their motion to strike the lobbying charges; Schenley, on the other hand, argues that the Court should not rule precipitously on those portions but should defer decision until it has the results of discovery on the nature and relevance of the lobbying.

the statute of limitations runs "from the commission of *the last overt act* alleged to have caused damage." (emphasis added) 153 F.Supp. at 593. Thus, where the Complaint alleges a conspiracy still ongoing at the commencement of the action, the statute would be no bar under a strict application of this theory. Also distinguishable is the situation in which overt acts were alleged within the statutory period but had caused no new damage, and the last acts causing damage had occurred more than four years past. E. g. Garelick v. Goerlich's Inc., 323 F.2d 854 (6 Cir., 1963).

 The Courts have resorted to a variety of metaphysical theories to deal with the conceptual complexities of an antitrust conspiracy in a sizeable industry. They are reviewed and disposed of to the satisfaction of this Court by the excellent and comprehensive opinion of Judge J. Skelly Wright in Delta Theaters, Inc. v. Paramount Pictures, 158 F.Supp. 644 (D.La.1958). I agree with Judge Wright that in the case of a continuing conspiracy, the plaintiff may recover for any damage which occurs within the period of limitations. See authorities cited in *Delta Theaters*, supra, 158 F.Supp at 649, n. 20, 21. But the thrust of this decision, as I understand it, is not that Schenley cannot plead and prove activities of the conspiracy prior to that period. It merely limits the damage for which Schenley seeks recovery to damages demonstrably arising within the 4 years prior to the Complaint. See Hanover Shoe Inc. v. United Shoe Machinery, 245 F.Supp. 258 (M.D.Pa., 1965); Streiffer v. Seafarers Sea Chest Corp., 162 F.Supp. 602 (E.D.La., 1958); but see Viking Theatre Corp. v. Warner Bros. Pictures, 264 F.Supp. 665 (E.D. Pa., 1967).

Finally, it should be noted that apart from the issue of damages, conspiratorial acts would be relevant to the determination of the prayer for injunctive relief, even though they took place more than four years ago. For all these reasons, the request to strike portions of the Complaint alleging acts more than four years prior to the filing of the Complaint is denied.

Let an appropriate Order be submitted, on notice to all parties.