**TRUCKING UNLIMITED et al.,**
**Plaintiffs-Appellants,**

v.

**CALIFORNIA MOTOR TRANSPORT**
**CO. et al., Defendants-Appellees.**

**No. 22462.**

United States Court of Appeals,
Ninth Circuit.

Oct. 5, 1970.

Michael N. Khourie (argued), J. Stanley Pottinger, Broad, Busterud & Khourie, San Francisco, Cal., for plaintiffs-appellants.

Boris H. Lakusta (argued), E. Myron Bull, Jr., David J. Marchant, Graham & James, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for Pacific Intermountain Express.

John MacDonald Smith, San Francisco, Cal. for Pacific Motor Trucking Co.

W. D. Bensen, Jr., Lubbock, Tex., for T.I.M.E. Freight, Inc.

Before HAMLIN and BROWNING, Circuit Judges, and PREGERSON,* District Judge.

BROWNING, Circuit Judge:

This is an action by one group of trucking companies against another seeking treble damages and injunctive relief under the Sherman and Clayton Acts, 15 U.S.C. §§ 1–27. All are common carriers regulated by the California Public Utilities Commission (PUC) and the Interstate Commerce Commission (ICC) and require licenses from these agencies to operate.

■ The complaint alleges a conspiracy among defendants to restrain and monopolize the highway common carriage business in California and elsewhere by a jointly financed, widely publicized program of opposing, before the two commissions and the courts, all applications by actual or potential competitors for the issuance, transfer, or registration of operating rights. The district court dismissed the action on the ground that the complaint failed to state a claim upon which relief could be granted. Fed.R. Civ.P. 12(b) (6).[1] For purposes of this appeal, we must accept all the allegations of the complaint as true, 2A Moore, Federal Practice ¶ 12.08, at 2266–67; and we can affirm only if "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). See Harman v. Valley National Bank, 339 F.2d 564, 565 (9th Cir. 1964); Corsican Productions v. Pitchess, 338 F.2d 441, 442 (9th Cir. 1964).

The district court held that relief was barred by Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), which hold that the Sherman Act does not forbid attempts to influence the passage or enforcement of laws. We disagree for two reasons. First, concerted employment of judicial and administrative adjudicative processes as part of a scheme to restrain trade, as alleged in this complaint, is not excluded from the Sherman Act by the *Noerr-Pennington* doctrine. Second, even if the *Noerr-Pennington* rule does apply to the use of judicial and administrative adjudicative processes in a scheme to restrain trade, relief is not barred if, as alleged in this complaint, the real purpose of defendants' joint activity was to restrain competitors directly, rather than to restrain them indirectly by inducing restrictive governmental action.

I

■ The *Noerr-Pennington* principle is a judicially implied exception to the general rule that an unlawful purpose may bring otherwise lawful means within the proscription of the Sherman Act. See American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). The exception's premise is that the responsibility for enacting or not enacting laws concerning trade restraints rests with the legislative branch of government; and, similarly, responsibility for enforcing or not enforcing those laws rests with the executive branch. *Noerr, supra,* 365 U.S. at 135–136, 81 S.Ct. 523. Hence, valid legislative or executive action that results in the restraint or monopolization of trade does not violate the Sherman Act. United States v. Rock Royal Co-operative, Inc., 307 U.S. 533, 560, 59 S.Ct. 993, 83 L.Ed. 1446 (1939).[2]

* Honorable Harry Pregerson, United States District Judge, Central District of California, sitting by designation.

1. The district court's opinion is reported at 1967 Trade Cas. ¶ 72,298 (N.D.Cal.1967).

2. The Supreme Court has also held that the Sherman Act does not apply to valid *state*

Attempts to influence the legislative and executive branches are also excluded from the Sherman Act because prohibiting such activity "would substantially impair the power of government to take actions through its legislature and executive that operate to restrain trade. In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives." *Noerr, supra,* 365 U.S. at 137, 81 S.Ct. at 529.[3]

■ And the Sherman Act does not apply to efforts to influence the enactment or enforcement of laws even when those efforts are motivated by an anticompetitive purpose because "it is quite probably people with just such a hope of personal advantage who provide much of the information upon which governments must act. A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would thus deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them." *Id.* at 139, 81 S.Ct. at 530.

This is a powerful argument for holding that joint efforts to influence legislative and executive action are excluded from Sherman Act liability regardless of purpose, but it does not justify immunizing agreements to utilize judicial and administrative adjudicative processes in a scheme to restrain trade. The fundamental reason for the *Noerr-Pennington* exception does not apply. It is not the function of the courts to determine whether laws restraining trade will be adopted or, having been adopted, whether they will be enforced; nor is this the function of an administrative agency engaged in adjudication, as the PUC and the ICC are here.[4] It would be pointless to limit the reach of the Sherman Act in order to protect the access of courts and agencies engaged in adjudicative functions to information and opinion rel-

legislative or executive action since "the Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state." Parker v. Brown, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943).

3. Such efforts are the "political activity" referred to in *Noerr*. The Court proffered two additional reasons for its holding: (1) the "essential dissimilarity" between agreements traditionally condemned by the Sherman Act—price fixing, boycotts and market divisions—and agreements to solicit the passage or enforcement of laws; and (2) the important constitutional questions concerning the right to petition the government that would be raised if the Act were construed to prohibit joint solicitation of government action.

4. Licensing proceedings are adjudicative rather than legislative in nature. 5 U.S.C. § 551(6)–(9). The PUC, for example, applies a standard of "public convenience and necessity," Cal.Pub.Util.Code § 1064, to the facts in each case—experience, financial ability, available equipment. *See, e. g.,* Encinal Terminals, 61 Cal.P.U.C. 807, 809–10 (1950). Davis characterizes as adjudicative "facts about the parties and their activities, businesses, and properties," 1 K. Davis, Administrative Law Treatise § 7.02, at 413 (1958), and Judge Friendly has described as judicial "the application of standards of greater or less generality to concrete cases." Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards, 75 Harv.L.Rev. 863, 874 (1962). Plaintiffs expressly excluded any PUC or ICC rule-making proceedings from the complaint.

Furthermore, beyond their efforts to influence administrative adjudicative processes, defendants allegedly pursued appeals in the courts from every adverse administrative determination. Even if the agency determinations were quasi-legislative, and thus within the *Noerr-Pennington* exception, court proceedings to review those determinations would be subject to the general strictures of the antitrust laws. *But see* Woods Exploration & Prod. Co. v. ALCOA, 284 F.Supp. 582, 594–595 (S.D. Tex.1968).

evant to determinations they have no power to make.[5]

Accordingly, the general rule is applicable—the Sherman Act is violated by a conspiracy to unreasonably restrain or monopolize trade through the use of judicial and administrative adjudicative proceedings. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L. Ed.2d 247 (1965); United States v. Singer Manufacturing Co., 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963); Kobe, Inc. v. Dempsey Pump Co., 198 F. 2d 416, 424–425 (10th Cir. 1952); Lynch v. Magnavox Co., 94 F.2d 883 (9th Cir. 1938); Slick Airways, Inc. v. American Airlines, Inc., 107 F.Supp. 199, 213–14 (D.N.J.1951), appeal dismissed, 204 F. 2d 230 (3d Cir. 1953).[6] See also Note,

---

5. The holding in *Pennington* that it was error to instruct the jury in that case that joint "approaches" to Tennessee Valley Authority officials and to the Secretary of Labor might be illegal if accompanied by an anticompetitive purpose is not inconsistent with our conclusion that efforts to influence administrative adjudicative proceedings are not within the *Noerr-Pennington* exemption.

There is nothing to indicate that the administrative action sought to be influenced was adjudicatory; the language of the *Pennington* opinion suggests that it was not. Clearly, the decision of TVA officials to purchase their coal requirements on the open market was not adjudicatory in character. The nature of the "approach" to the Secretary of Labor is unclear. The Secretary has a good deal of discretion in determining whether to initiate proceedings under the Walsh-Healey Act to set a minimum wage in a given industry. 41 C.F.R. § 50–203.15; see Modley, Patton & Reilly, Problem Child Among Labor Laws—The Walsh-Healey Act, 1963 Duke L.J. 205, 210, 221; 48 Dep't of Labor Ann.Rep. 250 (1960). If the "approaches" were to influence his exercise of that policy-making function under the Act, they were protected under *Noerr*. See Harman v. Valley Nat'l Bank, 339 F.2d 564, 566 (9th Cir. 1964). Moreover, even if we assume that defendants sought to influence the wage determination itself, the proceeding by which that determination is made, though including a hearing, 41 U.S.C. § 43a(b), is nonetheless rule-making and quasi-legislative in nature, see 5 U.S.C. § 551(4) & (5); Wirtz v. Baldor Elec. Co., 119 U.S.App.D.C. 122, 337 F.2d 518, 534 (1963), rather than adjudicative.

6. At the very least, these decisions demonstrate that agreements to use litigation as a means to restrain trade are not "essentially dissimilar," in the *Noerr* sense, from those traditionally condemned under the Sherman Act.

They also support the proposition that, on balance, the public interest in free competition served by the condemnation of agreements to use judicial and administrative adjudicative processes for the purpose of restraining trade outweighs the resulting restraint upon first amendment rights. See Note, The Brakes Fail on the Noerr Doctrine, 57 Calif.L.Rev. 518, 537–40 (1969). As the court observed in Kobe, Inc. v. Dempsey Pump Co., 198 F.2d 416, 424 (10th Cir. 1952):

"It is said that to allow recovery of damages resulting from the infringement action would be a denial of free and unrestricted access to the courts. We fully recognize that free and unrestricted access to the courts should not be denied or imperiled in any manner. At the same time we must not permit the courts to be a vehicle for maintaining and carrying out an unlawful monopoly which has for its purpose the elimination and prevention of competition."

See also Report of the Attorney General's National Committee to Study the Antitrust Laws 248 (1955).

The overwhelming public interest in uninhibited communication between the people and their legislators and law enforcement officials that justifies immunizing joint efforts to influence those authorities from antitrust liability despite either wrongful purpose or the use of distortion and deception, does not apply to presentations to judges and administrative officials in the course of adjudicative proceedings. Unlike legislators and law enforcement officials, judicial and administrative adjudicators do not act in a representative capacity. There is a marked difference between the processes by which they arrive at decisions, the materials upon which they may properly rely, and the atmosphere consistent with effective performance of their respective functions. Sheppard v. Maxwell, 384 U.S. 333, 350–351, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Bridges v. California, 314 U.S. 252, 271, 62 S.Ct. 190, 86 L.Ed. 192

The Brakes Fail on the Noerr Doctrine, 57 Calif.L.Rev. 518 (1969). *But see* Bracken's Shopping Center, Inc. v. Ruwe, 273 F.Supp. 606 (S.D.Ill.1967).[7]

The district court considered *Singer* and the other patent cases inapposite because they involved patent litigation [8] and because litigation was only one of several means employed in the scheme to restrain trade. The court did not explain the significance of either factor, and we do not see any.

Because the legal monopoly conferred by a patent lends itself to misuse as a means to illegally monopolize and restrain trade, it is often a significant factor in determining whether a particular course of conduct violates the Sherman Act that a patent is involved. This fact, however, has no bearing at all upon whether the *Noerr-Pennington* defense applies. That doctrine is concerned with protecting joint efforts to influence governmental action as such—the subject matter of the governmental action is beside the point. The significance of the cases cited is not that they involve the use of patent litigation to restrain trade, but that they involve the use of litigation for that purpose. They demonstrate that litigation can be an integral part of a scheme prohibited by the Sherman Act.

*Pennington* disposes of the second basis for distinction relied upon by the district court. If the *Noerr-Pennington* defense had applied to the use of litigation for the purpose of restraining trade, the defense would have been available whether this means was employed as part of a larger scheme or stood alone. *Pennington, supra,* 381 U.S. at 670, 85 S.Ct. 1585. Furthermore, litigation and threats of litigation were the only means used to exclude competitors in *Walker Process.*

■ We conclude, therefore, that the *Noerr-Pennington* defense does not bar relief when a conspiracy to employ judicial and adjudicative processes in a scheme to restrain trade is alleged.

## II

Dismissal was improper for another reason. Plaintiffs have alleged that defendants' real purpose was to restrain

(1941); Costilo, Antitrust's Newest Quagmire: The Noerr-Pennington Defense, 66 Mich.L.Rev. 333, 349 (1967); Note, The Brakes Fail on the Noerr Doctrine, 57 Calif.L.Rev. 518, 532–33 (1969); *cf.* Note, Application of the Sherman Act to Attempts to Influence Government Action, 81 Harv.L.Rev. 847, 849 (1968).

It is significant that in NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed. 2d 405 (1963), a decision heavily relied upon by defendants, the Supreme Court discussed with approval cases that rely upon the actor's purpose in distinguishing the lawful and ethical from the unlawful and unethical in the area of stimulating litigation, *see* 371 U.S. at 439–441, 83 S.Ct. 328, and repeatedly noted that the NAACP acted with a lawful purpose in urging utilization of the courts. *Id.* at 429–430, 439–441, 83 S.Ct. 328. *See also* Brotherhood of R. R. Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964); United Mine Workers v. Illinois State Bar Ass'n, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967).

7. Other decisions are distinguishable. E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority, 362 F.2d 52 (1st Cir. 1966), involved governmental rather than private action. In Okefenokee Rural Elec. Membership Corp. v. Florida Power & Light Co., 214 F.2d 413 (5th Cir. 1954), and Woods Exploration & Prod. Co. v. ALCOA, 284 F.Supp. 582 (S.D. Tex.1968), the only injury alleged resulted from valid governmental action. Both of those cases as well as Association of Western Rys. v. Riss & Co., 112 U.S.App.D.C. 49, 299 F.2d 133 (1962), Schenley Indus. Inc. v. New Jersey Wine & Spirit Wholesalers Ass'n, 272 F.Supp. 872 (D.N.J. 1967), and A.B.T. Sightseeing Tours Inc. v. Gray Line N. Y. Tours, 242 F.Supp. 365 (S.D.N.Y.1965), appear to have involved administrative rule-making rather than adjudication. Citizens' Wholesale Supply Co. v. Snyder, 201 F. 907 (3d Cir. 1913), involved efforts to influence a local prosecutor's enforcement of an ordinance, *see* Harman v. Valley Nat'l Bank, 339 F.2d 564 (9th Cir. 1964), and there was no allegation of anticompetitive purpose.

8. Slick Airways, *supra,* cited with approval by the Supreme Court in Continental Ore Co. v. Union Carbide & Carbon Co., 370 U.S. 690, 707, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), did not involve patent litigation.

trade directly, rather than indirectly through the medium of governmental action. If this is true, plaintiffs may prevail under the "sham" exception to the *Noerr-Pennington* rule regardless of the status of joint approaches to adjudicative bodies under that defense.

The plaintiffs in *Noerr* contended, and the trial court found, that the defendants sought to injure plaintiffs directly by destroying their good will with the public and with their customers, thus weakening their competitive position and causing them to lose business. The Supreme Court noted that "the apparent effect of these findings is to take this case out of the category of those that involve restraints through governmental action and thus render inapplicable" the principle that efforts to induce such governmental action do not violate the Sherman Act. 365 U.S. at 142, 81 S.Ct. at 532. The Supreme Court held, however, that plaintiffs' attempt to exclude their case from the latter category failed for want of evidence.

The Court pointed out that there was no finding that the defendants attempted directly to persuade anyone not to deal with the plaintiffs. On the contrary, the evidence reflected only efforts by the defendants to influence the passage and enforcement of laws. The Supreme Court concluded, therefore, that "the findings of the District Court that the [defendants'] campaign was intended to and did in fact injure the [plaintiffs] in their relationships with the public and with their customers can mean no more than that the [plaintiffs] sustained some direct injury as an incidental effect of the [defendants'] campaign to influence governmental action and that the [defendants] were hopeful that this might happen." *Id.* at 143, 81 S.Ct. at 532.

This was not enough to render defendants' publicity campaign actionable. The Court noted that whenever an attempt is made to influence legislation by such a campaign it is inevitable that some incidental injury will be visited upon the opponents and equally inevitable that those conducting the campaign will be aware of this possibility.

On the other hand:

"There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified. But this certainly is not the case here. No one denies that the [defendants] were making a genuine effort to influence legislation and law enforcement practices. Indeed, if the version of the facts set forth in the [plaintiffs'] complaint is fully credited, as it was by the courts below, that effort was not only genuine but also highly successful. Under these circumstances, we conclude that no attempt to interfere with business relationships in a manner proscribed by the Sherman Act is involved in this case." *Id.* at 144, 81 S.Ct. at 533.

The "sham" exception is derived from the basic rationale of the *Noerr-Pennington* defense: The Act does not bar legislation or law enforcement restraining trade and therefore does not bar the solicitation of such action. Conversely, if joint action is not for the purpose of restraining competition by inducing governmental action, but is rather for the purpose of imposing a direct restraint by the defendants' own conduct, the Sherman Act applies. *Cf.* Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 706–707, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

Plaintiffs assert that their proof [9] would establish such a conspiracy to impose a direct restraint under the guise of a program to induce governmental ac-

---

9. Some of the details recited appear in plaintiff's briefs and are not specifically set out in the complaint. The allegations of the complaint are clearly sufficient to allow their proof.

tion. Briefly, they make the following allegations.

It was and is the policy of the PUC to encourage competition in the trucking industry by freely granting, and approving the transfer of, certificates of public convenience and necessity. Until 1963 it was the policy of the ICC to register any certificate issued by the PUC automatically, without further hearing.

In 1961 defendant trucking companies, the largest highway common carriers in California and the western states, undertook to lessen competition from smaller companies resulting from the relatively easy access to operating rights. They decided to accomplish this objective, not by seeking to induce the PUC to change its policy, but rather by discouraging the filing of applications with the PUC and the ICC. To that end they agreed to take, and took, the following steps.

They agreed to and did establish and maintain a joint trust fund by monthly contributions based upon each defendant's gross income. They informed their competitors that they would use this trust fund to finance opposition to all applications then pending or thereafter filed by their competitors with the PUC or the ICC; that each and every application would be opposed with or without probable cause, and regardless of its merits; and that in every case defendants would pursue their opposition through all stages of administrative and judicial review. Defendants told their competitors that they could avoid the expense and delay resulting from defendants' opposition only by abandoning pending applications and severely limiting or refraining entirely from filing further applications.

As a direct result of defendants' joint activities, the financial resources of plaintiffs and other competitors of the defendants were depleted; applications by plaintiffs and other competitors for the issuance, transfer, or registration of operating rights were defeated, delayed, or restricted; and plaintiffs and other competitors were deterred from instituting or pursuing such applications. De-

fendants' joint activities effectively foreclosed plaintiffs and other competitors from access to the PUC, the ICC, and to the courts in review proceedings; it denied those agencies and the courts the benefit of facts and information required for the making of competent decisions; and it severely curtailed competition.

The rationale underlying the *Noerr-Pennington* defense does not dictate immunity for this alleged conspiracy. The purpose of defendants' joint activity was not to induce action by the affected governmental agencies, but to preclude it. That is hardly a "genuine" effort to influence governmental action in the *Noerr* sense. Prohibiting such joint activity under the Sherman Act would not "impair the power of government to take actions * * * that operate to restrain trade." *Noerr, supra,* 365 U.S. at 137, 81 S.Ct. at 529. It would not impede "the ability of the people to make their wishes known to their representatives" in any legitimate sense, *id.*; nor "deprive the government of a valuable source of information." *Id.* at 139, 81 S.Ct. at 531.

Nonetheless, the district court held the "sham" exception inapplicable because plaintiffs did not allege that the presentations defendants made to the agencies and the courts were in themselves false, misleading, or lacking in evidentiary or legal support. But the question is whether the defendants sought to restrain competition by inducing restrictive governmental action, on the one hand; or, on the other, sought to restrain competition by the deterrent effect of their own joint activity.

That their joint activity took the form, in part, of solicitation of governmental action and that they made a genuine effort to support all protests as effectively as possible would not negate a primary purpose to restrain competition directly. The means allegedly adopted by defendants to deter agency action was to discourage the filing of requests for such action by a jointly financed, well publicized program of opposing every application filed. Since all applications were to be opposed, it is irrelevant that a valid

basis existed for opposing some applications. Nor it is relevant that the opposition was as effective as defendants could make it; mere token opposition would not have the requisite deterrent effect.

The purpose of this alleged conspiracy was to inflict injury upon competition directly by defendants' own joint activity. Inevitably, given the nature of the means employed, defendants' activity would also injure competitors indirectly by influencing rulings of the agencies and the courts. Here, however, that indirect injury is merely incidental; and its occurrence cannot justify application of the *Noerr-Pennington* defense. As a practical matter, to hold otherwise would make the "sham" exception inapplicable to any conspiracy to restrain trade cloaked with the mantle of a campaign to influence governmental action. *Cf. Noerr, supra,* 365 U.S. at 143–144, 81 S. Ct. 523.

Reversed and remanded for further proceedings.

HAMLIN, Circuit Judge (dissenting):

I respectfully dissent.

Section 1063 of the California Public Utilities Code provides that no highway common carrier may operate without a certificate from the Public Utilities Commission "declaring that the public convenience and necessity require such operation." In order to exercise its judgment implementing the broad statutory standard of "public convenience and necessity" in an individual case, the Public Utilities Commission is largely dependent upon information provided by the applicant and competing carriers. See Peninsula Motor Express, 49 Cal. P.U.C. 807 (1950). The activities of defendants in supplying this information to the Commission is thus lawful.

In my view, the activities of the Public Utilities Commission in the implementation of the broad statutory standard is one akin to policy making. The participation of the defendants in this policy making process, through their opposition to the grant of certificates or transfers of certificates is in my opinion protected from Sherman Act liability by the decisions of the United States Supreme Court in *Noerr* and *Pennington,* despite the assumption, arising from the posture of this case, that defendants have an anti-competitive motive. The Public Utilities Commission has the power and ability to correct any abuses flowing from the activities of defendants through their opposition to the grant or transfer of certificates, see California Public Utilities Code §§ 1062, 1064, and I think that the plaintiffs must look to the Commission, rather than to the Sherman Act, for their remedy. See George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25, 30 (1st Cir. 1970). See generally, Note, Application of the Sherman Act to Attempts to Influence Government Action, 81 Harv.L.Rev. 847 (1968).

For these reasons, and for the reasons stated by Judge Sweigert in his United States District Court decision, reported in 1967 Trade Cases ¶ 72,298 (N.D. Cal.1967), I would affirm.