**MARK AERO, INC., d/b/a Missouri Air Commuter Company, Appellee,**

v.

**TRANS WORLD AIRLINES, INC. and Frontier Airlines, Inc., Appellants.**

**Nos. 77–1760, 77–1761.**

United States Court of Appeals, Eighth Circuit.

Submitted January 12, 1978.

Decided July 6, 1978.

Rehearing and Rehearing En Banc Denied July 28, 1978.

Kent E. Whittaker of Hillix, Brewer, Hoffhaus & Whittaker, Kansas City, Mo. (argued), Terrence Ahern and William D. Calkins, Kansas City, Mo.; and Wilbur L. Fugate of Morison, Murphy, Abrams & Haddock, Washington, D. C., on brief, for appellant Frontier Airlines, Inc.

Alvin D. Shapiro of Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo. (argued), and Sheryl B. Etling, Kansas City, Mo., on brief, for appellant Trans World Airlines, Inc. '

Richard D. Rhyne, Kansas City, Mo. (argued), Harold L. Fridkin and John R. Cleary, Kansas City, Mo., on brief, for appellee.

Before BRIGHT and HENLEY, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

This is a private civil antitrust action. The basic question presented is the use to be made of the old Kansas City Municipal Airport. The plaintiff, Mark Aero, Inc., is a chartered air taxi operator. It wants to reopen the old airport, now closed to commercial operations, to begin a new scheduled air passenger service between Kansas City and St. Louis, Missouri. The defendants, scheduled air carriers, Trans World Airlines, Inc. (TWA) and Frontier Airlines, Inc. (Frontier) maintain scheduled air passenger service between Kansas City and St. Louis, Missouri. They oppose the reopening. The plaintiff's efforts before the Kansas City municipal government having been

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

unsuccessful over a period of time, it invites us to resolve the matter through the application of the antitrust acts. We decline to do so and order the case dismissed. This is a governmental problem, to be solved by the electorate through its proper officials. There is no warrant for our intervention on plaintiff's theory that the antitrust statutes control.

The District Court denied defendants' motions to dismiss the plaintiff's antitrust action.[1] This is an appeal, upon certification, of the interlocutory order thereupon entered.[2] We find that the District Court erred in its application of the *Noerr-Pennington*[3] doctrine, the sole issue presented,[4] and we remand with directions to dismiss the complaint.

The City of Kansas City operates two airports, the Kansas City International Airport, which was opened to airline traffic in 1972, and the Kansas City Municipal Airport, an older and smaller facility located much closer to the downtown area. Since 1972, when all of Kansas City's scheduled air passenger service was transferred to Kansas City International, the Municipal Airport has served the City's other, general aviation, needs.

In the implementation of the City's policy concerning the opening or closing of its airports, the City is exercising part of the broad powers of self-government granted to it as a chartered home-rule city under the Missouri Constitution. Article 6, § 19(a) of the Missouri Constitution provides:

> Any city which adopts or has adopted a charter for its own government, shall have all powers which the general assembly of the state of Missouri has authority to confer upon any city, provided such powers are consistent with the Constitution of this State and are not limited or denied either by the charter or adopted or by statute. Such a city shall, in addition to its home rule powers, have all powers conferred by law.

In particular, Missouri statutes specifically authorize "the local legislative body of any city * * * to * * * establish, * * * own, * * * operate, and regulate * * * airports"[5] and to vest the authority to operate such an airport "in any suitable officer, board or body of such city * * *."[6]

1. Each of plaintiff's three successive complaints has charged that Frontier and TWA violated § 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to unreasonably restrain trade. Other allegations assert that the defendants conspired and combined to monopolize trade, and monopolized that trade, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, and that the defendants' practices violated the Missouri antitrust laws. Damages are sought in the amount of $25,000,000.

District Court jurisdiction was asserted under 28 U.S.C. § 1337 and 15 U.S.C. § 15.

2. 28 U.S.C. § 1292(b); Fed.R.App.P. 5.

3. *Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

4. The Application for Leave to Appeal states: The question involved is "Under *Noerr-Pennington*, is denial of 'free and meaningful access' to a city council and to a municipal agency, without more, a sufficient overt act to support a claim for conspiracy to violate the antitrust laws?"

* * * * * *

* * * If this Court should decide the District Court was in error in refusing to apply *Noerr-Pennington* to plaintiff's second amended complaint, it will to all intents and purposes dispose of this litigation, * * *. App., at 182–83.

5. Mo.Rev.Stat. § 305.170 provides as follows:

The local legislative body of any city, including cities under special charter, village or town in this state is hereby authorized to acquire, by purchase or gift, establish, construct, own, control, lease, equip, improve, maintain, operate, and regulate, in whole or in part, alone or jointly or concurrently with others, airports or landing fields for the use of airplanes and other aircraft either within or without the limits of such cities, villages, or towns, and may use for such purpose or purposes any property suitable therefor that is now or may at any time hereafter be owned or controlled by such city, village, or town.

6. Mo.Rev.Stat. § 305.210 provides as follows:

The local legislative body of a city, including cities under special charter, village, town or county which has established an airport or landing field and acquired, leased, or set apart real property for such purpose may construct, improve, equip, maintain and op-

The excerpts of the Kansas City Charter before us indicate that the City's legislative powers are exercised by the City Council, acting through passage of ordinances.[7] Administration of city policies is entrusted to a professional City Manager, who serves at the pleasure of the Council.[8] In turn, the City Manager appoints the directors of the departments in the city administration. One such department is the Aviation Department.

The Director of the Aviation Department is "responsible for the management and operation of all the buildings and fields owned and operated by the city for the purposes of serving aviation,"[9] and for study of, and recommendations respecting, the direction of City policy to the City Manager, and ultimately, to the "local legislative body" authorized under Mo.Rev.Stat. §§ 305.170 and 305.210, *supra*, the City Council.

Mark Aero's efforts to obtain the use of the old Municipal Airport for its new air operations have been opposed by the City on several grounds. The Director of Aviation summarized the bases for his opposition as (1) the FAA Regional Director's desire to confine all scheduled air carrier operations to Kansas City International, (2) fear that air carrier competition between the more accessible Municipal Airport and Kansas City International would endanger the economic position of Kansas City International, and (3) the opposition of the City bond advisors, who were concerned about the revenue bond financing of Kansas City International.[10] One major obstacle to re-

erate the same, or may vest jurisdiction for the construction, improvement, equipment, maintenance, and operation thereof, in any suitable officer, board or body of such city, village, town or county, or may by franchise or contract authorize others, in whole or in part, to construct, equip, maintain, and operate the same. The expense of such construction, improvement, equipment, maintenance and operation shall be a city, village, town or county charge, in whole or in part, as the case may be. The local legislative body of a city, village, town, or county may adopt regulations and establish fees or charges for the use of such airport or landing field.

7. Article II, § 6 of the City Charter vests the powers of the City in a thirteen-member City Council.

   Article I, § 2 of the Charter provides:

   All powers conferred upon the city by this charter, or by the general laws of the state, shall be exercised by ordinance, except as otherwise provided by this charter or by law.

8. Article III, § 20 of the Kansas City Charter.

9. Administrative Code of Kansas City, Missouri, § A 5.4 provides as follows:

   The director of aviation shall be responsible for the management and operation of all the buildings and fields owned and operated by the city for the purpose of serving aviation; shall negotiate all leases for the facilities under his control; shall study and make recommendations to the city manager concerning the regulation and development of aviation, including proposals for the enlargement of existing, or the addition of new, facilities to serve the aviation industry adequately; shall make recommendations to the city manager of programs for the promotion and growth of aviation; and shall perform such other related duties as required by the city manager or the council.

10. Mr. Delbert F. Karmeier, Acting Director of Aviation, explained his opposition in detail in a letter to the Director of the Federal Aviation Administration, dated March 20, 1975:

   Kansas City does not generate sufficient air traffic to support two air carrier airports. Such competition between two airports in Kansas City's airport system we see as endangering the viability of both. Kansas City International Airport, located 18 miles from downtown, has been developed with revenue bond funds and federal air grants. In competition with an airport closer to the center of population and more familiar to Kansas City residents, KCI could suffer a crippling economic blow. We have been warned of such by our bond advisors * * *. It has taken us two years to see a recovery from the depression in our traffic at KCI caused, as we are told by our transportation consultant, by the transfer from the close-in Municipal Airport to the more remote Kansas City International Airport. The transfer to the new airport was made possible only through the commitment of the City and the carriers to remove all air carriers operations from Municipal Airport. This move was recognized by all as being demanded by the physical restraints present at Municipal Airport—the inability to extend its runways, the proximity of residential and commercial developments and the hazards caused by the levees at both ends of the principal runway, to name only a few of the more obvious.

   App., at 51.

opening lay in the fact that the Municipal Airport was not in compliance with Federal Aviation Administration regulations governing security for scheduled air passenger operations.[11]

In February, 1974, plaintiff made a formal demand on the City, asking it to order the City Aviation Department to act upon plaintiff's request that the City submit an appropriate security plan to the FAA. A resolution was introduced before the Kansas City City Council which would have ordered the Aviation Department to comply with plaintiff's request to reopen the Municipal Airport, but the record does not disclose action upon the resolution. The City continued its policy that all scheduled airline traffic be routed through Kansas City International Airport.

The proposal to reopen the older airport to scheduled passenger service raises a governmental policy question, which, as the record makes clear, involves risks to the new airport, risks as to airport financing, and a shift in airport activity. In determining this policy, a governmental, nonadjudicatory function is being exercised. The resolution of such questions is a matter of city government.

The original complaint in this suit, filed October 1, 1975, asserted that defendants, Frontier and TWA, had violated the Sherman Act by conspiring to unreasonably restrain the trade in transportation of air passengers in interstate commerce. To fur-

ther this conspiracy, TWA and Frontier had allegedly "induced others to make false and misleading statements to the City of Kansas City," and coerced the City Aviation Department to refuse to apply to the FAA for approval of security measures at Kansas City Municipal Airport.[12]

On February 15, 1976, the District Court held that the application of principles of primary jurisdiction required that the action be stayed pending outcome of plaintiff's resort to administrative remedies before the Civil Aeronautics Board.[13] The court noted that this disposition of the case made it unnecessary to address the application of the *Noerr-Pennington* doctrine.

With the court's permission, plaintiff subsequently filed its first amended complaint. This complaint mirrored the original but omitted ¶¶ 14(d) and (e), those allegations which had led the District Court to apply the doctrine of primary jurisdiction.

After arguments on reconsideration of the stay, the District Court concluded that the deletion of paragraphs 14(d) and (e), *supra,* from the original complaint made the doctrine of primary jurisdiction inapplicable. The court also held that the allegations remaining in the complaint averred conduct beyond the reach of the antitrust laws, concluding, correctly, that "both paragraphs [14(b) and (c)] at most allege attempts by defendants to induce unnamed legislative and executive officials of the City of Kansas City to take certain actions

---

**11.** 14 C.F.R. § 107, the so-called antihijacking regulations.

**12.** Paragraph 14 of the Complaint stated that the defendants committed the following acts in furtherance of the alleged conspiracy.

(a) Engaged in acts of unfair competition for the purpose and effect of destroying MARK AERO as a competitor and rendering it incapable of competing as an air carrier between Kansas City, Missouri, and St. Louis, Missouri;

(b) Induced others to make false and misleading statements to the City of Kansas City, Missouri, with the intention that said statements would be relied upon by the City to plaintiff's detriment;

(c) Induced and coerced the Aviation Department of the City of Kansas City, Missouri, to refuse to make application to the FAA for

approval of a Master Security Plan pursuant to FAR 107, (said system to be financed by plaintiff) as requested by plaintiff in its attempt to initiate operations out of Kansas City Municipal Airport;

(d) Exchanged and acted upon information regarding schedules, fares and other matters in order to disadvantage and injure MARK AERO; and

(e) Undertook a boycott of MARK AERO by measures designed to prevent passengers from cancelled TWA and FRONTIER flights between Kansas City, Missouri and St. Louis, Missouri, from traveling on MARK AERO flights.

**13.** The decision is reported at *Mark Aero, Inc. v. Trans World Airlines,* 411 F.Supp. 610 (W.D. Mo.1976).

which have an anti-competitive impact on plaintiff. This is essentially the type of political activity protected from the anti-trust laws by the *Noerr-Pennington* doctrine." [14] Both paragraphs were stricken and it was held that ¶ 14(a), standing alone, was too conclusionary to state a valid anti-trust claim.

In January, 1977 the plaintiff filed its second amended complaint, now before us. The allegations of acts done in furtherance of a conspiracy to unreasonably restrain trade were rewritten. To the first amended complaint, allegations were added: that both the Aviation Department of Kansas City and the City Council were "adjudicatory bodies" and that the defendants' actions "prevented plaintiff from enjoying free and meaningful access" to those bodies. [15]

The defendants renewed their motions to dismiss the complaint for failure to state a claim, but the motions were denied. The District Court held that by the allegations now made, that defendants have conspired "to deny the plaintiff free and meaningful access to the City Council and the Aviation Department," the "plaintiff has sought to invoke the 'sham' exception to the *Noerr-Pennington* doctrine announced in *California Motor Transport,*[16]" [17] (hereafter *California Motor*). The District Court subsequently granted defendant Frontier's motion to certify that the applicability of the *Noerr-Pennington* doctrine to the facts alleged involves a controlling question of law meriting an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This Court subsequently granted defendants' petitions for leave to take an interlocutory appeal.

The "*Noerr-Pennington*" doctrine refers to the teachings of *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), (*Noerr*) and *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), (*Pennington*). In the *Noerr* case a group of trucking companies and their trade association brought suit against, primarily, a group of railroads, for violations of §§ 1 and 2 of the Sherman Act. It was charged in the complaint that the defendants had conducted a deceptive publicity campaign against the

14. *Mark Aero, Inc. v. Trans World Airlines, Inc.,* No. 75 CV 659–W–3, slip op. at 10 (W.D.Mo. August 16, 1976) (unreported).

15. Paragraph 14 of the second amended complaint states as follows:

In furtherance of the aforesaid combination and conspiracy, the defendants, and each of them, have done those things which they combined and conspired to do, including, inter alia:

(a) Engaged in a publicity campaign involving the media and various citizen groups which was undertaken with the intent to prevent plaintiff from enjoying free and meaningful access to the Aviation Department of Kansas City, Missouri and to the City Council of Kansas City, Missouri in order to prevent plaintiff from providing services as an air carrier between Kansas City, Missouri and St. Louis, Missouri to its customers and to the air traffic public in general.

(b) Prevented plaintiff from enjoying free and meaningful access to the Aviation Department of the City of Kansas City, Missouri, an adjudicatory body, by inducing and coercing said agency to refuse to make application to the FAA for approval of a Master Security Plan pursuant to FAR 107 as requested by plaintiff. Said actions were undertaken by the defendants with predatory intent to prevent plaintiff from providing ser-

vice as an air carrier between Kansas City, Missouri and St. Louis, Missouri to its customers and to the air traffic public in general.

(c) Prevented plaintiff from enjoying free and meaningful access to the City Council of the City of Kansas City, Missouri, an adjudicatory body, by intentionally making and inducing others to make false and misleading statements to, and by the use of economic coercion on, that body and members thereof. Said actions were taken with predatory intent to prevent plaintiff from providing service as an air carrier between Kansas City, Missouri and St. Louis, Missouri to its customers and to the air traffic public in general.

(d) Engaged in the acts described in paragraphs 14(a), 14(b), and 14(c), and other acts of unfair competition, for the purpose and effect of destroying MARK AERO as a competitor and rendering it incapable of competing as an air carrier between Kansas City, Missouri and St. Louis, Missouri.

16. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (footnote ours).

17. *Mark Aero, Inc. v. Trans World Airlines, Inc.,* No. 75 CV 659–W–3, slip. op. at 5 (W.D.Mo. May 20, 1977).

trucking industry in order to foster the "adoption and retention of law and enforcement practices destructive of the trucking business * * * and to impair the relationships existing between the truckers and their customers."[18]  The district court found that the railroads' publicity campaign was malicious, fraudulent, and violative of the Sherman Act. The Court of Appeals for the Third Circuit affirmed. A unanimous Supreme Court reversed, the Court holding in part that:

> We accept, as the starting point for our consideration of the case, the same basic construction of the Sherman Act adopted by the courts below—that no violation of the Act can be predicated upon mere attempts to influence the passage or enforcement of laws. It has been recognized, at least since the landmark decision of this Court in *Standard Oil Co. v. United States*, [362 U.S. 947, 80 S.Ct. 862, 4 L.Ed.2d 866], that the Sherman Act forbids only those trade restraints and monopolizations that are created, or attempted, by the acts of "individuals or combinations of individuals or corporations." Accordingly, it has been held that where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out. These decisions rest upon the fact that under our form of government the question whether a law of that kind should pass, or if passed be enforced, is the responsibility of the appropriate legislative or executive branch of government so long as the law itself does not violate some provision of the Constitution.
>
> We think it equally clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly.[19]

In *Pennington* the Court reiterated the holding of *Noerr* and clarified the scope of its application. *Pennington* alleged that certain coal companies and the U.M.W. had lobbied before the Secretary of Labor to obtain adjustments to the TVA wage and purchasing policies as part of a conspiracy to drive small coal companies out of business. The Court held that such lobbying before the Secretary of Labor was immune under the Sherman Act, stating that

> *Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.
>
> * * * Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.[20]

The use of the term public official clearly expanded the *Noerr* decision, which had referred only to legislative or executive action. *Noerr* and *Pennington* read together, have been correctly summarized by a commentator[21] as holding that "joint efforts to influence government action are outside the scope of the Sherman Act, even if the combination is formed for the sole purpose of eliminating competitors."[22]

The Court in *California Motor* described the dual underpinnings of the *Noerr* and *Pennington* decisions:

> (1) In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold,

---

**18.** *Noerr, supra* 365 U.S. at 129, 81 S.Ct. at 525.

**19.** *Id.,* at 135–36, 81 S.Ct. at 528 (footnotes omitted).

**20.** *Pennington, supra* 381 U.S. at 670, 85 S.Ct. at 1593.

**21.** Note, *Trade Regulation: Noerr Antitrust Immunity—Defining the Sham Exception,* 29 Okla.L.Rev. 512 (1976).

**22.** *Id.,* at 514.

at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act.

(2) The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.[23]

■ At the doctrine's inception, the Supreme Court carefully observed that resort to governmental processes may be employed unscrupulously as a pretext to abuse a competitor. The *Noerr* decision included a caveat, the so-called sham exception, stating:

> There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified. But this certainly is not the case here. No one denies that the railroads were making a genuine effort to influence legislation and law enforcement practices.[24]

*Application of the sham exception was first confirmed by the Supreme Court in California Motor.* The court of appeals summarized the facts of that case as follows:

> [The defendants] agreed to and did establish and maintain a joint trust fund by monthly contributions based upon each defendant's gross income. They informed their competitors that they would use this trust fund to finance opposition to all applications then pending or thereafter filed by their competitors with the PUC or the ICC; that each and every application would be opposed with or without probable cause, and regardless of its merits; and that in every case defendants would pursue their opposition through all stages of administrative and judicial review. Defendants told their competitors that they could avoid the expense and delay resulting from defendants' opposition only by abandoning pending applications and severely limiting or refraining entirely from filing further applications.[25]

It was, in short, "[a] combination of entrepreneurs to harass and deter their competitors from having 'free and unlimited access' to the agencies and courts, to defeat that right by massive, concerted, and purposeful activities." [26]

In the light of this background it was held that "[o]n their face the above-quoted allegations come within the 'sham' exception to the *Noerr* case, as adapted to the adjudicatory process." [27] Disclosed was the essential element of the sham exception, whether employed in an adjudicative or nonadjudicative setting, namely, an absence of a genuine effort to influence government but, rather, an intent to injure a competitor directly.[28]

---

23. *California Motor, supra* 404 U.S. at 510, 92 S.Ct. at 611 (citations omitted).

24. *Noerr, supra* 365 U.S. at 144, 81 S.Ct. at 533.

25. *Trucking Unlimited v. California Motor Transport Co.,* 432 F.2d 755, 762 (9th Cir. 1970).

26. *California Motor, supra* 404 U.S. at 515, 92 S.Ct. at 614.

27. *Id.,* at 516, 92 S.Ct. at 614.

28. As Professor Handler has observed, [T]he *California Motor Transport Co.* plaintiffs carefully refrained from basing their cause of action upon any actual attempt to influence the course of administrative action. When the defendants met in February of 1961 they had no knowledge of the merits of any future application. All they knew was that the California PUC had traditionally adopted a liberal approach with respect to granting new operating rights, but according to plaintiffs' assertions, defendants specifically eschewed any attempt to change the agency attitude. The plan was not to influence government, but rather to deter competitors from making applications that would set the public decision-making apparatus into motion. Such a scheme, if proven, would be embraced by the sham exception since * * it involved nothing more than a direct restraint on competitors.

This perspective was reinforced in *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), where the Court summarized *California Motor* as a case "where we held that the principle of *Noerr* may also apply to the use of administrative or judicial processes where the purpose to suppress competition is evidenced by repetitive lawsuits carrying the hallmark of insubstantial claims and thus is within the 'mere sham' exception announced in *Noerr*."[29]

Turning now to the specific allegations before us, we observe at the outset that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted).[30] Even when tested by this standard, none of the defendants' alleged wrongful acts constitute more than joint efforts to influence the City officials' decision in the airport controversy. Paragraph 14(a) alleges a publicity campaign undertaken to restrict plaintiff's access to City officials. Paragraph 14(b) charges that defendants induced the Aviation Department to refuse to take action favorable to plaintiff's position. Paragraph 14(c) alleges that defendants made misrepresentations to and "economically coerced" the City Council. All of these actions are joint efforts to influence governmental action. As such they fall within the *Noerr* umbrella and cannot give rise to Sherman Act liability.

It matters not that the sole purpose alleged to underlie the attempt to influence governmental action was to hamper a competitor's business activities. The plaintiffs in *Noerr* relied upon

> the fact * * * that the railroads' sole purpose in seeking to influence the passage and enforcement of laws was to destroy the truckers as competitors for the long distance freight business. But we do not see how this fact * * * could transform conduct otherwise lawful into a violation of the Sherman Act. All of the considerations that have led us to the conclusion that the Act does not apply to mere group solicitation of governmental action are equally applicable in spite of the addition of this factor. The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws can not properly be made to depend upon their intent in doing so. It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors.[31]

Moreover, these principles apply regardless of the fact that the conduct "falls far

---

Handler, M., *Twenty-Five Years of Antitrust* (Twenty-Fifth *Annual Antitrust Review*), 73 Colum.L.Rev. 413, 436–37 (1973) (footnotes omitted).

   *See also,* Fischel, D., *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine,* 45 U.Chi.L.Rev. 80, 105 (1977) ("Construing the sham exception as enunciated in *Noerr* to include all activity not genuinely designed to influence the government is more consonant with the Court's central ruling"); Note, *Antitrust-Noerr-Pennington Doctrine-Metro Cable Co. v. CATV of Rockford, Inc.,* 17 B.C.Indus. & Com.L.Rev. 511, 523–24 (1976).

**29.** 410 U.S. at 380, 93 S.Ct. at 1031. In *Otter Tail* the Court vacated the district court's judgment which had held that *Noerr-Pennington* immunity was inapplicable to the institution of judicial proceedings. The case was remanded for reconsideration in light of *California Motor.*

**30.** Quoted in *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1975), in which Mr. Justice Marshall, speaking for a unanimous Court, stated that "in antitrust cases, where the proof is largely in the hands of the alleged conspirators, . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Id.*

   However, "[i]n testing the legal sufficiency of the complaint the well-pleaded allegations are taken as admitted by conclusions of law and unreasonable inferences or unwarranted deductions of fact are not admitted." *Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968, 973 (8th Cir. 1968), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969).

**31.** *Noerr, supra* 365 U.S. at 138–139, 81 S.Ct. at 530 (footnote omitted); *see also Pennington, supra* 381 U.S. at 670, 85 S.Ct. 1585.

short of the ethical standards generally approved in this country." [32]

It follows, *a fortiori,* that any incidental damage resulting from the City's legislative inaction is not actionable.

Mark Aero maintains that its averments of prevention of "free and meaningful access" to the organs of City government state a valid claim under the sham exception.

The fundamental question presented in each case involving the "sham" exception, whether argued in a nonadjudicative or an adjudicative setting, is the question of intent. Normally, in a nonadjudicative setting, such as the legislative arena, it presents no particular problem. But in the adjudicative setting the question can become more complex. As always in deciding questions of intent, the court considers all of the surrounding circumstances and assigns to each circumstance an appropriate weight, dependent upon the function and significance of each. Thus in *California Motor* the Court considered the "manner of exercise of the right of association and petition," the defendants' other activities against competitors, and the adamant stand taken in defendants' opposition to other applications, all to ascertain whether there was a true intent to injure competitors directly rather than to influence governmental action. The distillation of all of the applicable factors in each case governs the decision as to true intent, whether it is to directly injure competitors rather than to influence governmental action. In *California Motor* a consideration of all of the factors lead the Court to conclude that the allegations came within the sham exception in the *Noerr* case, "as adapted to the adjudicatory process" [33] in that the defendants' purpose was to deny a competitor "free and meaningful access to the agencies and courts." [34]

The insurmountable difficulty with attempting to utilize that case as precedent here lies in the difference in the specific factual allegations relied on. We have heretofore summarized those of *California Motor.* In the case before us it is alleged that the defendants have engaged in a publicity campaign involving the media and various citizens groups, that they have induced the Aviation Department of the City to refuse to make application to the FAA for approval of a master security plan, that they have made and induced others to make false and misleading statements to, and used "economic coercion" on, the City Council. These actions may all be admitted, and we take them as true, but what is being complained about is genuine political activity, protected by the first amendment rights of free speech and freedom of petition.[35] Such activity cannot provide the basis for a Sherman Act claim, nor does it "bar access" in the sense employed in *California Motor.* The construction of the Act contended for by the defendants would extend the Sherman Act into regulation of political activity contrary to the *Noerr* case.

Accepting as true all properly pleaded allegations, the order of the District Court denying appellants' motions to dismiss is reversed, and the cause is remanded with instructions to dismiss the second amended complaint.

---

**32.** *Noerr, supra* 365 U.S. at 140, 81 S.Ct. at 531. *See also Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 228 (7th Cir. 1975).

**33.** *California Motor, supra* 404 U.S. at 516, 92 S.Ct. at 614.

**34.** *Id.,* at 515, 92 S.Ct. at 614.

**35.** *Franchise Realty Interstate Corp. v. San Francisco Local Joint Exec. Bd.,* 542 F.2d 1076, 1082 (9th Cir. 1976), *cert. denied,* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977).